O’Neill, J.
The first question to be determined is: Was the plaintiff guilty of negligence which proximately contributed to cause the collision so as to prevent plaintiff’s recovery against the defendant as a matter of law?
If the plaintiff was guilty of negligence as a matter of law, then the plaintiff can not recover and it is unnecessary for this court to examine the other questions presented here.
The plaintiff asserts that, since the defendant has printed only a part of the record, this court is limited to a consideration of the printed record and the judicial determinations which it presents. The court does not agree with that position. The entire record is before this court and, in deciding this case, the court will examine the entire record. The writer of this opinion *151 has read and examined with care the entire record in this case, which is on file in this court.
The exact point upon which the question of plaintiff’s negligence turns is whether the operator (an employee of the plaintiff) of the swing span of the bridge was under a legal duty to look and, if he did look, to see the defendant’s ship, the Canadiana. If he looked and failed to see the ship, which was plainly there to be seen, and closed the swing span of the bridge in the face of it, he was guilty of negligence, and the plaintiff can not recover under the rule of law of Detroit, Toledo & Ironton Rd. Co. v. Rohrs, 114 Ohio St., 493, 151 N. E., 714; Toledo Terminal Rd. Co. v. Hughes, 115 Ohio St., 562, 154 N. E., 916; Patton, Admx., v. Pennsylvania Rd. Co., 136 Ohio St., 159, 24 N. E. (2d), 597; Boles v. Baltimore & Ohio Rd. Co., 168 Ohio St., 551, 156 N. E. (2d), 735.
Judge Matthias, writing in the Boles case, supra, quoted an opinion of Judge Kinkade in the case of D., T. & I. Ry. Co. v. Rohrs, supra, as follows:
‘ ‘ Surely it will not do for one to claim the right to recover simply because he has looked and did not see, if the conditions are such that, had he looked, he must have seen. When he says he did look, and the conditions establish the fact that any one who looked would have seen, then, if he says he did not see, his own evidence establishes the fact that he did not look, though he may think he did. To hold otherwise would simply be a manifest absurdity * *
The pertinent testimony by the bridge operator which brings the instant case within the rule laid down in D., T. & I. Rd. Co. v. Rohrs, supra; Toledo Terminal Rd. Co. v. Hughes, supra; and Boles v. B. & O. Rd. Co., supra, is as follows:
“Q. Referring to the late afternoon, and up to the time of the accident, do you recall what the weather was? A. It was cloudy, but visibility was good.
U # # #
“Q. As the Taplin cleared the draw span of the Toledo Terminal bridge, what did you do? A. I rechecked and seen nothing and proceeded to close.
*152 “Q. Where did you go to close — to operate the control? A. Back to the platform — to the outer rail, as we always do.
U * # #
“Q. At that time were, the controls starting the rotation of the bridge — were the controls on the upstream or the downstream side of the control house? A. On the upstream side.
“Q. And what did you do? A. I started moving the bridge in a counterclockwise position.
i i * * *
“Q. What occurred next? A. Just started moving and I heard five short blasts.
“Q. And did you see what ship those blasts came from? A. Not at the first instant, no.
“Q. Did you shortly thereafter? A. Shortly thereafter, yes.
“Q. Where did you look to see that? A. I just looked back over my shoulder, after setting all the brakes I had.
“Q. What ship did you see? A. The Canadiana.
“Q. In what position? A. It was — it had struck my northeast corner of the bridge.
6 ( * * *
“Q. Did you talk with anyone who was aboard the Canadiana? A. I asked was anybody hurt seriously and how bad, if they knew.
“Q. Did you say anything to the effect you didn’t see them or didn’t hear them? A. I did.
“Q. And is that correct? A. That is correct. I did say so. I said: ‘I didn’t hear nor see you.’ ”
On cross-examination, the bridge operator testified as follows :
“ Q. So you stayed on the platform then from the time the Tapi in proceeded from the Coast Guard station until he was in the draw sufficiently so you could get the name of the ship? A. I stepped out as soon as the draw was open and waited there to catch the name, etc.
“Q. And you stayed out' there, did you? A. Until I received the name of the boat and I stepped in and logged the name.
*153 “Q. Isn’t it true there is a little catwalk with that platform? A. There is a catwalk, yes sir.
“Q. Does it go around the corner of the house? A. Around the corner of the gas tank.
“Q. Did you walk around the corner at all? A. No sir.
“Q. Did you see any other ships coming downstream from the Coast Guard station?
“Mr. Gosline: Upstream.
“The Witness: Upstream.
“Q. (By Mr. Ballard) Upstream from the downstream area?
“The Court: Coming from the lake into Toledo.
“A. No sir.
“Q. You didn’t see any ships? A. No sir.
“Q. And all the time that you stood out there, from the time the Taplin had blown her signal coming past the Coast Guard station and got into your draw where you could check her name, you never saw any other ship? A. No.
“Q. You never saw the Canadiana? A. No sir.
“Q. Have you any estimate as to the size of the Canadiana? A. Not offhand, no sir.
‘ ‘ Q. Do you know how many decks she has ? A. Two decks.
“Q. Two decks above the main deck? A. I believe so.
“Q. Would it be a fair estimate to say she is 30 to 40 feet above the water? A. I don’t know, sir.
“Q. What is the color of the hull of the Canadiana? A. White.
“Q. And it was white on July 20 [sic], 1958, was it? A. Yes sir.
“Q. And the visibility was clear, was it? A. Yes sir.
“Q. It was not raining at that time? A. No sir.
< ( & * #
“Q. Every Wednesday you would have been in the bridge when the Canadiana passed through at that time, at the same time, is that correct? A. Yes sir.
“Q. This happened on the 30th day of July, 1958, is that correct? A. That’s right.
“Q. Now, going backwards, from the 30th of July, you in *154 dicate defendants’ exhibit Number 2, which is the inbound passages through your bridge, going back one week would be July 23rd, is that correct? A. Yes sir.
“Q. Will you show us the time, on July 23rd, that the Canadiana passed through that bridge on the inbound passage? A. It passed through at 6:19.
“Q. Going back one week prior to July 23rd, which would be July 16th, will you tell us what the inbound passage of the Canadiana was on that day? A. That was 6:15.
“Q. And going back one week prior to that, which would be July 9th, what would the inbound passage of the Canadiana be on that date ? A. 6:10.
“Q. Now turning to defendants’ exhibit Number 2, to the date of this accident, there is an entry here with regard to the Canadiana and will you read your entire entry on the inbound passage of the Canadiana on July 30th? A. ‘The Canadiana hit bridge at 6:10. Didn’t hear whistle or didn’t see him. He was in west channel. ’
“Q. It says ‘Didn’t see him in west channel?’ A. Yes sir.
“Q. What does 6:12 represent here? A. That was the time of the collision.
“Q. Is this 6:10 you have here, in the note here, in error then? A. I would say it would be in error on my side, yes, in that respect — a couple of minutes there.
“Q. Now, when the Taplin cleared the easterly draw of this bridge, I believe you have previously testified that as she came into the draw you were out on the platform and caught the name of the ship, is that correct? A. Yes sir.
“Q. When did you go back inside the control house? A. As soon as the ship came broadside and I got the name, I went in and logged the ship.
“Q. You didn’t wait to see if the stern went through the bridge? A. Not at that particular moment.
“Q. You went in and logged it? A. Yes.
“Q. Where is the log in the control house? A. On the desk, alongside the control house.
“Q. After you made the log entry what was your next movement? A. Stepped back in the log room and checked the channel.
*155 ££Q. When you stepped back out to recheck the channel what did you do ? A. I looked up and down the stream on the river.
££Q. Where was the Taplin at that time? A. He was about midway between me and the Wheeling bridge.
££Q. At that time you had not started to close the bridge? A. No.
££Q. You looked out and saw the Taplin half way between you and the Wheeling bridge? A. I wouldn’t say half way— midway.
££Q. When you looked down the stream what did you see? A. I didn’t see nothing.
££Q. Now, did you step back into the control room at that time? A. Yes sir.
“Q. And what was your movement as you went back into the control room? A. I proceeded to close the bridge.
í i # * #
££Q. When you stepped back from the platform into the control house to close the bridge did you make any other observation downstream other than those you had made from the platform? A. I glanced out the windows to make sure of sail boats and such as that.
Í 6 * # *
f£Q. On the day in question you said that you looked out the windows also downstream? A. That’s right.
££Q. Now, did you go from here into the control room and back out into the room where the mule is? A. I didn’t have to go in there to cheek that.
££Q. What windows did you look out? A. I looked out this window here and this window here at that time. (Indicating)
££Q. And where were you standing when you looked out the window that would face downstream? A. I was standing at the control box.
“Q. I see. You didn’t go out to the window then to look before you swung the bridge? A. No sir.
( i # * #
“Q. Do you have a desk near your control box with a chair, etc.? A. Yes, we do.
*156 “Q. From that position what is yonr view upstream and downstream? A. It is a very good view of the river.
“Q. When you say it is a very good view of the river, can you see out the windows both up and down stream? A. Yes sir.
‘ ‘ Q. How about if the doors are closed between the control room and the machinery room? A. You can still see, sir.
“Q. Sitting down? A. Sitting down.if necessary.
“Mr. Gosline: Is this when the bridge is open or closed?
“Mr. Ballard: Closed.
“Q. Are there any obstructions to your view at that time? A. With the bridge open or closed?
“Q. Let’s take it with the bridge closed, is there any obstruction to your view? A. There is a limited amount, yes sir.
“Q. What constitutes the obstruction to your view? A. The structure of the bridge.
“Q. When you say 'structure’ you are referring to the cross-members of the draw? A. Yes.
“Q. Are any of those cross-members immediately adjacent to the windows facing downstream? A. As I say there is a limited amount of visibility in that respect.
“Q. How far from the windows that face downstream are the closest cross-members ? A. I will say 6 or 7 feet.
“Q. What is the size of that cross-member? A. About 3 by 3 — angle iron.
“Q. Is there anything that would obstruct your view from the control house of a large white boat in the channel of the river, let’s say, within 200 feet or so of the west draw on downstream side of the bridge, when the bridge is in an open position, with the stairway towards the easterly bank of the river, and assume this large boat is approximately 200 feet long, 50 feet wide and 35 or 40 feet high? A. Like I say, we have a limited amount of visibility there at the time.
“Q. The question I am asking you, is there anything would block out your view of anything that large? A. Not completely, no sir.
“Q. Now, as I understand, when the Taplin cleared the bridge you came back in off the platform and went into the con *157 trol house and looked up and downstream and didn’t see the Canadiana — you put the control lever on the swing draw over to your right and locked it in position. A. You don’t lock it in position.
“Q. You release the button so it will hold? A. Are you referring to as the bridge was in motion?
“Q. To get it in motion. A. Yes, it is set by notches.
“Q. You can release it? A. Yes, it is notches that starts the bridge out and it holds then.
“Q. When you heard the danger signal of the Canadiana you were undoubtedly startled by that, were you? A. I was quite surprised.”
The evidence shows that in the month prior to July 30,1958, the Canadiana passed this drawbridge between 6:06 and 6:41 p. m. each day, and that the operator had logged this time in his log book each day so that he knew that the Canadiana was due to pass his bridge shortly after 6:00 p. m. The accident occurred in midsummer — on July 30, 1958, at 6:14 p. m.
The swing span was open and the steamer Taplin had passed through. The span was standing stationary in open position as the steamer Canadiana approached it.
The operator of the swing span testified that he had a clear view of the river, and that he looked and checked but did not see the Canadiana.
The weather was clear, visibility was good, and the white color of the vessel was in sharp contrast to the dark water. The Canadiana was 210 feet long, 56 feet wide, almost 50 feet high, and was painted white. The Canadiana was close enough to the bridge for the master of the ship to hear the bridge mechanism click when the operator started to close it.
The testimony quoted above, compared with that in the Rohrs case, supra, and measured by the rule in the Patton and Boles cases, supra, makes it plain that the plaintiff herein was guilty of negligence as a matter of law.
It is not necessary to discuss the other errors claimed to have been committed by the Court of Appeals. The plaintiff can not recover.
The judgment of the Court of Appeals is, therefore, re *158 versed, and the judgment of the Common Pleas Court for the defendant is affirmed.

Judgment reversed.

Zimmerman, acting C. J., Younger, Taet, Matthias and Bell, JJ., concur.
Herbert, J., not participating.
Zimmerman, J., sitting in the place and stead of Weygandt, C. J.
Younger, J., of the Third Appellate District, sitting by designation in the place and stead of Zimmerman, J.